UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Koehler Paper SE and Koehler Oberkirch GmbH, f/k/a Papierfabrik August Koehler SE,<br><br>         Plaintiffs,<br><br>    v.<br><br>United States,<br><br>         Defendant. | Court No. 21-00633 |

### COMPLAINT

  Pursuant to Rule 3(a)(2) of the Rules of the United States Court of International Trade, plaintiffs Koehler Paper SE and Koehler Oberkirch GmbH, formerly known as Papierfabrik August Koehler SE (collectively, "Koehler"), by and through its counsel, allege and state as follows:

### DETERMINATION CONTESTED

  1.  Koehler brings this action pursuant to Section 516A of the Tariff Act of 1930, as amended (the "Tariff Act"), 19 U.S.C. § 1516a, to seek judicial review of certain aspects of (i) the final determination by the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation of thermal paper from Germany; and (ii) the final antidumping duty order issued by Commerce on thermal paper from Germany.

  2.  Commerce published its final determination in connection with this antidumping duty investigation in the Federal Register on September 30, 2021. *See Thermal Paper from Germany: Final Affirmative Determination of Sales at Less than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 86 Fed. Reg. 54,152 (Sept. 30, 2021) (the "Final Determination").

3. Commerce published the Antidumping Duty Order in the Federal Register on November 22, 2021. *See Thermal Paper from Germany, Japan, the Republic of Korea, and Spain: Antidumping Duty Orders*, 86 Fed. Reg. 66,284 (Nov. 22, 2021) (the "Antidumping Duty Order").

4. Commerce's determinations, findings, and conclusions in connection with the Final Determination and the Antidumping Duty Order are set out in the following memoranda:

- "Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value in the Antidumping Duty Investigation of Thermal Paper from Germany," dated September 24, 2021 (the "I&D Memo");

- "Analysis of Business Proprietary Information in the Final Determination," dated September 24, 2021 (the "BPI Final Determination Memo");

- "Final Determination Margin Calculation for Papierfabrik August Koehler SE," dated September 24, 2021 (the "Final Calculation Memo"); and

- "Thermal Paper from Germany: Final Scope Decision," dated September 24, 2021 (the "Final Scope Memo").

5. As described below, the contested aspects of the Antidumping Duty Order and the Final Determination issued by Commerce are not supported by substantial evidence and are otherwise not in accordance with law.

## JURISDICTION

6. Koehler brings this action pursuant to Sections 516A(a)(2)(A)(i)(II) and 516A(a)(2)(B)(i) of the Tariff Act, 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II), (B)(i).

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), which grants this Court exclusive jurisdiction over civil actions commenced pursuant to Section 516A of the Tariff Act, 19 U.S.C. § 1516a.

## STANDING

8. Plaintiff Koehler Oberkirch GmbH, is a German limited liability company that was formerly known as Papierfabrik August Koehler SE. Throughout the period of investigation for

the proceeding before Commerce (October 1, 2019 – September 30, 2020), Koehler Oberkirch GmbH produced thermal paper primarily through its subsidiary Koehler Kehl GmbH, which directly owned its thermal paper manufacturing facilities. Koehler Oberkirch GmbH (then known as Papierfabrik August Koehler SE) was a party to the proceeding before Commerce and participated in the investigation that gave rise to the contested determination. Effective May 3, 2021, ownership of Koehler Kehl GmbH was transferred to Koehler Paper SE. Effective November 26, 2021, Papierfabrik August Koehler SE changed its name to "Koehler Oberkirch GmbH" and its legal form from a European company to a German limited liability company. As an interested party that participated directly in the investigation that gave rise to the contested determination, Koehler Oberkirch GmbH has standing to commence this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

9.   Plaintiff Koehler Paper SE is a European company based in Germany and a foreign producer of thermal paper. Effective May 3, 2021, Koehler Kehl GmbH, the entity that directly owns the thermal paper manufacturing facilities primarily at issue in Commerce's antidumping investigation, was transferred to Koehler Paper SE. As such, Koehler Paper SE is the successor-in-interest to Koehler Oberkirch GmbH with respect to the production facilities it held through Koehler Kehl GmbH. As it is a foreign producer of subject merchandise, through its indirect subsidiary Koehler Kehl GmbH, and the successor in interest to a participant in the investigation that gave rise to the contested determination, Koehler Paper SE has standing to commence this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## TIMELINESS OF THE ACTION

10.   Commerce published the Antidumping Duty Order in the Federal Register on November 22, 2021. Plaintiffs filed a Summons in this action on December 22, 2021, which is within 30 days after the date of publication of the Antidumping Duty Order. Plaintiffs have

therefore commenced this action by the timely filing and service of a Summons with this Court within the statutory time limit specified in 19 U.S.C. § 1516a(a)(2)(A)(i)(II).

11. This Complaint is being filed within thirty days after the filing of the Summons in this action and therefore is timely within the statutory time limit specified in 19 U.S.C. § 1516a(a)(2)(A), 28 U.S.C. § 2636(c), and CIT Rule 3(a)(2).

## PROCEDURAL HISTORY

12. On October 7, 2020, petitioners Appvion Operations, Inc. ("Appvion") and Domtar Corporation ("Domtar," and with Appvion, the "Petitioners"), filed a petition (the "Petition") with Commerce alleging that imports of thermal paper from Germany (as well as Japan, Korea, and Spain) were being, or were likely to be, sold in the United States at less than fair value.

13. Commerce requested additional information pertaining to the Petition through supplemental questionnaires issued on October 13, 2020, and October 20, 2020. Petitioners responded to these supplemental questionnaires on October 16, 2020, and October 21, 2020, respectively.

14. On October 27, 2020, Commerce issued a notice of the initiation of a less than fair value investigation, with a period of investigation of October 1, 2019, through September 30, 2020. *See Thermal Paper from Germany, Japan, the Republic of Korea, and Spain: Initiation of Less-Than-Fair Value Investigations*, 85 Fed. Reg. 69,580 (Nov. 3, 2020). Commerce defined the scope of the investigation as covering "thermal paper from Germany, Japan, Korea, and Spain . . . in the form of 'jumbo rolls' and certain 'converted rolls.'" *Id.* at 69,584. Commerce further specified that the scope of the investigation would cover "thermal paper with or without a base coat (typically made of clay, latex, and/or plastic pigments, and/or like materials) on one or both sides; *with thermal active coating(s) (typically made of sensitizer, dye, and co-reactant, and/or like*

*materials)* on one or both sides; with or without a top coat (typically made of pigments, polyvinyl alcohol, and/or like materials), and without an adhesive backing." *Id.* (emphasis added).

15. On November 27, 2020, Commerce limited the number of respondents to the largest producer or exporter of subject merchandise by volume, and selected Koehler Oberkirch GmbH (then known as Papierfabrik August Koehler SE) for individual examination in the investigation.

16. In the early stages of the investigation, Koehler presented evidence that one of its thermal paper products, its Blue4est® developer-free paper, was not within the scope of the investigation, as defined in the Petition.

    a. In its initial notice of investigation, Commerce's description of the term "thermal active coating" only referred to the chemical coating used in traditional thermal paper to generate an image when heat is applied by triggering a chemical reaction. There is no mention of thermal imaging processes that do not rely on active coatings consisting of a "sensitizer, dye, and coreactant, and/or like materials" in the initial notice of investigation or the Petition.

    b. Koehler's Blue4est® paper does not contain any sensitizer, dye, coreactant or "like materials." It uses a unique, physical process to generate an image using a thermal printer. Unlike traditional thermal paper, which includes a "thermal active layer" consisting of chemicals that react to form an image when heat is applied, Blue4est® paper contains a solid color layer underneath a thermal layer with no active chemicals. The thermal layer for Blue4est® paper contains hollow particles, or air bubbles, in an opaque top layer. When heat is applied, the hollow particles in the thermal layer collapse, making selected portions of that layer transparent and exposing selected portions of the color layer beneath. In other words, Blue4est® paper has a persistent color layer that does not depend on any chemical process to create an image, whereas traditional thermal papers require a chemical reaction to produce an image.

        c. On December 16, 2020, following Koehler's request concerning cost reporting for Blue4est® paper, Commerce granted Koehler a cost reporting exemption for Blue4est® paper.

        d. In its initial Section A Questionnaire Response, which was submitted on January 12, 2021, and in its initial Section B Questionnaire Response, which was submitted on January 25, 2021, Koehler clearly stated its position that Blue4est® paper is not "subject merchandise" and offered evidence to support its conclusion. Nonetheless, Koehler provided sales data in its home market database for purposes of transparency.

    17. Prior to the <u>Preliminary Determination</u>, evidence offered by Koehler provided extensive detail about the unique and patented physical process used in Blue4est® paper, how that process makes that product substantially different from traditional thermal paper, and why it falls outside of the scope of investigation as defined by Petitioners. Koehler further noted that environmental protection authorities in the United States and Germany had specifically recognized that the lack of a thermal active coating in Blue4est® paper gives that product substantial distinguishable environmental benefits. Moreover, Koehler offered evidence that, unlike traditional thermal paper, Blue4est® paper has been independently certified for direct food contact—again because of its lack of chemical processes. Koehler explained that these important distinguishing features are entirely dependent on the use of a physical process, rather than a chemical process as in traditional thermal paper.

    18. In response, Petitioners argued that the physical process used in Blue4est® paper was functionally equivalent to the "thermal active coating" described in the Petition. However, Petitioners offered no evidence to support its argument or to contradict Koehler's position.

19.   On May 6, 2021, Commerce released its preliminary determination in the investigation. *See Thermal Paper From Germany: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 26,001 (May 12, 2021) (the "Preliminary Determination"). Commerce announced a preliminary estimated weighted-average dumping margin of 2.78%. *Id.* at 26,002.

20.   Commerce's preliminary determinations, findings, and conclusions in connection with the Preliminary Determination were set out in the following memoranda:

- "Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Thermal Paper from Germany," dated May 5, 2021 (the "Preliminary Determination Memo");

- "Preliminary Determination Margin Calculation for Papierfabrik August Koehler SE", dated May 5, 2021 (the "Preliminary Calculation Memo"); and

- "Thermal Paper from Germany, Japan, the Republic of Korea, and Spain: Preliminary Scope Decision," dated May 5, 2021 (the "Preliminary Scope Memo").

21.   In connection with the Preliminary Determination, Commerce agreed with Koehler's position that Blue4est® paper was outside the scope of investigation, as originally defined by the Petitioners and Commerce, and took the position that Blue4est® paper does *not* use a thermal active coating. *See* Preliminary Calculation Memo at 1–2. In so finding, Commerce rejected the Petitioners' argument that the definition of subject merchandise in the Petition included Blue4est® paper and that the use of a physical rather than a chemical process in Blue4est® paper was a "distinction without a difference."

22. While Commerce correctly determined, in the first instance, that Blue4est® paper was outside of the scope of the investigation, in its Preliminary Determination, it misapplied a statistical method to determine whether targeted or "masked" dumping may have occurred and, as a result, applied a methodology for calculating the weighted average dumping margin that is arbitrary, capricious, and contrary to law.

    a. In calculating the weighted-average dumping margin for the Preliminary Determination, Commerce determined that a "differential pricing analysis" was appropriate to determine whether the "Average-to-Average" ("A-A") method, the "Average-to-Transaction" ("A-T") method or a mixed method should be applied. Typically, Commerce uses the A-A method to calculate the weighted-average dumping margin, *see* 19 C.F.R. § 351.414(c)(1), but it may use the A-T method as an alternative (or a mixed method) when it determines that targeted or "masked" dumping has occurred such that the A-A method is no longer appropriate. *See* 19 U.S.C. § 1677f-1(d)(1)(B); 19 C.F.R § 351.414(b)(3). (*See* Preliminary Determination Memo at 7–8.)

    b. As explained by Commerce, the A-A method involves a comparison of the weighted average normal value to weighted average export prices or constructed export prices, whereas the A-T method involves a comparison of the weighted average normal value with the export prices or constructed export prices of individual sales. Commerce decides which method to apply based on a "differential pricing analysis" that "examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions or time periods." (Preliminary Determination Memo at 7.) The net effect of using the A-T method (or the mixed alternative) is that non-dumped sales are eliminated from the calculation (or "zeroed"), thereby increasing the dumping margin.

c. As the first step in its "differential pricing analysis," Commerce employs the Cohen's *d* test, which is a statistical measure of the significance of the difference between the mean of a test group and the mean of a comparison group. Commerce calculates the Cohen's *d* test for each test group within region, purchaser, and time-period categories. As applied by Commerce, a Cohen's *d* equal to or greater than 0.8 for any test group indicates that the U.S. sales prices for a given product in the test group are significantly different from the U.S. sales prices for the same product in the comparison group. Commerce calculates the Cohen's *d* statistic across all possible test groups versus control group comparisons within each of the three identified categories (*i.e.*, region, purchaser, and time period), and then tentatively applies a "ratio test." Under the ratio test, if the total percentage of transactions with a Cohen's *d* result at or above 0.8 is 33% or less, Commerce applies the A-A method. If the total percentage of transactions at or above 0.8 is 66% or more, Commerce applies the A-T method. Finally, if the total percentage of transactions at or above 0.8 is between 33% and 66%, Commerce applies a hybrid approach through which the results of the application of A-A method for transactions with a Cohen's *d* below 0.8 and the A-T method for transactions with a Cohen's *d* at or above 0.8 are combined to arrive at a single final dumping margin. (Preliminary Determination Memo at 8.)

d. If the ratio test indicates that an alternative method such as the A-T method may be employed, Commerce then determines whether using the default A-A method can account for the observed pricing patterns. Specifically, Commerce calculates the weighted average dumping margin by applying each of the three methodologies (A-A, mixed and A-T), and if the resulting margin based on the application of the A-A method is below the *de minimis* threshold, while the margin based on the application of the alternative method is above the *de minimis* threshold, Commerce finds that the A-A method cannot account for the observed difference and

applies the alternative method to the extent consistent with its application of the Cohen's *d* and ratio tests. (Preliminary Determination Memo at 8–9.)

23. Here, Commerce preliminarily determined that between 33% and 66% of Koehler's U.S. sales (made through its distributors Matra Atlantic GmbH and Matra Americas, LLC) passed the Cohen's *d* tests, and that there was a "pattern of prices that differ significantly among purchasers, regions, or time periods." (Preliminary Calculation Memo at 3.) Accordingly, Commerce applied zeroing, thereby finding a non-*de minimis* antidumping duty margin that would not exist absent application of the Cohen's *d* test.

24. The linchpin of Commerce's differential pricing analysis requires the proper application of the Cohen's *d* test. Yet, as recognized by the United States Court of Appeals for the Federal Circuit, the Cohen's *d* test generally requires that the test groups and the comparison groups be "normally distributed, of sufficient size, and of roughly equal variances." *Stupp Corp. v. United States*, 5 F.4th 1341, 1344, 1360 (Fed. Cir. 2021). On its own terms, the Cohen's *d* test is *not* a useful and meaningful measure of the difference between two groups unless these requirements of normality, size, and equal variance are satisfied. *A fortiori*, the Cohen's *d* test can only be used to determine whether "there is a pattern of export prices . . . for comparable merchandise that differ significantly among purchasers, regions, or periods of time," *see* 19 U.S.C. § 1677f-1(d)(1)(B)(i), such that the alternative A-T method is legally permissible, if all three requirements of normality, size, and equal variance are satisfied.

25. Critically, prior to finding that there was a "pattern of prices that differ significantly . . . among purchasers, regions, or periods of time" in reliance on the Cohen's *d* statistic, Commerce did not conduct an analysis to determine whether the U.S. sales data, as grouped within regional, purchaser, and time-period categories for use in Commerce's application of the test,

satisfied the requirements of normality, size, and equal variance. As recognized by the United States Court of Appeals for the Federal Circuit, *see Stupp*, 5 F.4th at 1356–40, Commerce's failure to make a threshold finding that the application of the Cohen's *d* test to the relevant sales data satisfies these requirements raises "significant concerns" about (i) the appropriateness of the "interpretive cutoffs" it has selected; (ii) whether the failure to show normality in particular could cause "serious flaws in interpreting" the result of the test; (iii) whether the failure to show adequate size could produce "an upward bias in the calculated effect size"; and (iv) whether the failure to show equal variance between the data sets being compared may "artificially inflate the dumping margins for a set of export sales prices that has minimal variance," such that "[a]n objective examiner inspecting those export sales prices would be unlikely to conclude that they embody a 'pattern' of prices that 'differ significantly.'" *Stupp*. 5 F.4th at 1357–59.

26. As explained in Koehler's joint case brief submitted together with Matra on August 16, 2021, the application of the Cohen's *d* analysis by Commerce in the Preliminary Determination was legally and factually erroneous because, when Commerce issued the Preliminary Determination, it had not considered whether the threshold requirements for application of the Cohen's *d* statistic were satisfied. Moreover, as Koehler demonstrated in that case brief the record data showed that the test groups Commerce used in its differential pricing analysis failed all three requirements of normality, size, and variance. To demonstrate the problems with Commerce's analysis, Koehler submitted an analysis of the computer data supporting Commerce's Cohen's *d* test, which data had not been provided to Koehler until after the Preliminary Determination was issued. Koehler showed that the core statistical assumptions of the Cohen's *d* test were not satisfied, and argued that, because Commerce failed to explain why the application of Cohen's *d* was appropriate notwithstanding the failure to satisfy these statistical assumptions, Commerce's

differential price analysis to apply the A-T method to a portion of Koehler's sales was fatally flawed and contrary to law. As such, Koehler argued that Commerce should have applied the A-A method and determined that the weighted average dumping margin was below the *de minimis* threshold.

27. Commerce rejected Koehler's submission on Commerce's improper application of the Cohen's *d* test for its differential price analysis because it supposedly contained "new" information. Although Koehler could not have submitted any comment on Commerce's use of Cohen's *d* prior to receipt of the Preliminary Determination and the disclosure of Commerce's underlying analysis, Commerce claimed that Koehler's submission was improper and untimely. By rejecting this submission, Commerce compounded its legal error and deprived Koehler of any meaningful opportunity to comment on this important legal and factual issue.

28. On September 27, 2021, Commerce released its final results to Plaintiffs and other parties in the proceeding and announced a final estimated weighted-average dumping margin of 2.90%. *See* Final Determination at 66,286. As noted above, the Final Determination was published in the Federal Register on September 30, 2021.

29. In the Final Determination, Commerce erroneously determined to include Koehler's Blue4est® paper as "subject merchandise" within the scope of its investigation, despite its prior findings that Blue4est® paper was *not* within scope.

    a. In making this new finding, Commerce did not base its decision on the submission of new evidence or legal authority. Rather, Commerce changed its position based on Petitioners' conclusory argument that, notwithstanding the carefully defined scope of the Petition, any paper that can be used to create an image on the paper through a thermal process qualifies as "thermal paper," even though Commerce had rejected this precise argument when it issued the

Preliminary Determination and even though it did not identify any record evidence to support this new position.

      b. While Petitioners had specified the term "thermal active coating" to indicate the presence of particular *chemicals* used to create a thermal image (specifically, a sensitizer, dye, and co-reactant, and/or like materials), Commerce arbitrarily determined that the physical process used for Blue4est® paper satisfied Petitioner's definition because there is some functional overlap between Blue4est® paper and traditional thermal paper that uses a chemical process.

      c. In other words, Commerce interpreted the term "thermal active coating" to mean simply "thermal coating"—effectively reading the term "active" out of the phrase. In the Final Determination, Commerce failed entirely to address the arguments or evidence submitted by Koehler establishing that Blue4est® paper has important distinguishing properties and unique applications for environmental and food safety. Commerce's failure to explain why its conclusions changed between the Preliminary Determination and the Final Determination, even though the record did not change, was arbitrary, capricious, and contrary to law.

30. In the Final Determination, Commerce largely adhered to its prior erroneous application of the Cohen's *d* test.

      a. In connection with the Final Determination, Commerce determined that more than 66% of Koehler's U.S. sales (via distributors Matra Atlantic GmbH and Matra Americas, LLC) exceeded the 0.8 threshold, and that the A-A method could not account for the purported differences. Based on those determination, Commerce calculated the weighted-average dumping margin for all U.S. sales using the A-T method. (Final Calculation Memo at 5–6.)

b.   In the Final Determination, Commerce disregarded the concerns expressed by the Federal Circuit in *Stupp*, 5 F.4th at 1357–59, about the proper statistical assumptions underlying its application of the Cohen's *d* test.

c.   Instead of addressing these concerns and re-considering its approach in light of *Stupp*, Commerce claimed that Koehler's concerns regarding the lack of a finding that the normality, size, and equal variance requirements for the Cohen's *d* test were misplaced because "the U.S. sales data which Koehler reported to Commerce constitutes a complete population." This precise argument was rejected by the Federal Circuit in *Stupp*, which stated that, "[w]hile Commerce is correct that it does not 'sample' data, that observation does not address the fact that . . . [the] interpretive cutoffs" were "derived . . . under the assumption of normality."  5 F.4th at 1360.

d.   Moreover, Commerce failed entirely to address the specific arguments raised by Koehler that the small sizes and disparate variances in the sales data created "an upward bias in the calculated effect size" or "artificially inflate[d] the dumping margin for a set of export sales prices that has minimal variance."

e.   In addition, Commerce acted arbitrarily and contrary to law when it failed to consider whether it should adjust its use of 0.8 as the appropriate cut-off for determining the presence of a significant difference between the test and control groups.

31.   Based on the Final Determination, Commerce issued the Antidumping Duty Order on November 22, 2021.  The Antidumping Duty Order, like the Final Determination, announced an estimated weighted-average dumping margin of 2.90%.

## STATEMENT OF CLAIMS

32.   Paragraphs 1 through 31 are incorporated by reference.

33. In the following respects and for other reasons apparent from the record of the administrative proceedings, Commerce's <u>Final Determination</u> and <u>Antidumping Duty Order</u> are not supported by substantial evidence on the record and are not in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

## COUNT ONE

34. Paragraphs 1 through 33 are incorporated by reference.

35. Commerce's decision to include Blue4est® sales within the scope of the investigation when it issued the <u>Final Determination</u> and the <u>Antidumping Duty Order</u>—a reversal of its position in the <u>Preliminary Determination</u>—is unsupported by substantial evidence and otherwise not in accordance with law.

36. As the record before Commerce established, Koehler's Blue4est® paper does not use a "sensitizer, dye, and coreactant, and/or like materials." In contrast to traditional thermal papers that use a "thermal *active* coating" as defined by Petitioners, Koehler's Blue4est® paper uses a purely *physical* process, and no chemical reaction or dye activation is involved in the image generation process.

37. In connection with the <u>Preliminary Determination</u>, Commerce correctly rejected Petitioners' argument that Koehler's patented Blue4est® process fell within the definition of "thermal active coating" and properly found that Blue4est® paper was outside of the scope of the investigation.

38. Prior to the <u>Preliminary Determination</u>, Koehler stated its position that, consistent with the definitions in the Petition, Blue4est® was outside of the scope of the investigation, and offered substantial evidence to support that position.

39. Commerce's decision to reverse course in the <u>Final Determination</u> was not based on any new evidence or legal authority offered by Petitioners. Rather, it simply reflects a

conclusory decision to ignore the limited scope of the term "thermal paper" as defined in the Petition. Commerce failed to explain the reasoning for the change in its position or even identify the arguments or evidence it considered that resulted in that change. By failing to explain the "factual and legal conclusions" that resulted in its reversed finding, Commerce violated 19 C.F.R § 351.225(f)(5).

40. As a result of its arbitrary scope determination, Commerce erroneously included Blue4est® paper when calculating the weighted average dumping margin.

41. For the foregoing reasons, Commerce's determination that Blue4est® paper "has a thermal active coating" and was thus in the scope of the investigation, was arbitrary and capricious, unsupported by substantial evidence, and contrary to law.

## COUNT TWO

42. Paragraphs 1 through 41 are incorporated by reference.

43. Commerce erred in calculating the weighted average dumping margin applicable to Koehler when it found that a pattern of targeted or "masked" dumping occurred based on the application of the Cohen's *d* test in the Final Determination.

44. Specifically, by applying the A-T method to certain Koehler sales data in reliance upon its application of the Cohen's *d* statistical test, without first assuring that the Cohen's *d* test requirements of normality, size, and equal variance were satisfied, Commerce acted arbitrarily, capriciously, and contrary to law. Absent a substantial factual basis in the record to support the application of the A-T method for calculating the weighted average dumping margin, Commerce was legally required to apply the A-A method, according to which the weighted average dumping margin would have been below the *de minimis* threshold.

45. Compounding this error, Commerce's rejection of Koehler's submission on Commerce's improper application of the Cohen's *d* test because it purportedly contained "new

information" was arbitrary and capacious. Commerce provided its Cohen's *d* analysis for the first time in conjunction with the Preliminary Determination. Koehler, therefore, could not have commented on the Cohen's *d* analysis prior to the Preliminary Determination. Thus, Commerce erroneously deprived Koehler of a meaningful opportunity to comment on this issue. That deprivation was also arbitrary and capricious and contrary to law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) hold that the Antidumping Duty Order and the Final Determination are unsupported by substantial evidence and not otherwise in accordance with law;

(2) remand this matter to Commerce for disposition consistent with the final order of this Court; and

(3) provide such other relief as this Court deems just and proper.

Dated:  New York, New York        Respectfully submitted,
January 21, 2022

DECHERT LLP

By: _____s/ F. Amanda DeBusk_____
F. Amanda DeBusk

F. Amanda DeBusk
Vincent H. Cohen, Jr.
Navpreet K. Moonga
1900 K Street, NW
Washington, DC  20006
amanda.debusk@dechert.com
vincent.cohen@dechert.com
navpreet.moonga@dechert.com
Tel.: +1  202  261  3300

Paul Curran Kingsbery
1095 Avenue of the Americas
New York, New York 10036
paul.kingsbery@dechert.com
Tel.: +1 212 698 3500

Micah Brown
Cira Centre, 2929 Arch Street
Philadelphia, PA 19103
micah.brown@dechert.com
Tel.: +1 215 994 2527

*Attorneys for Plaintiff Koehler Paper SE and Koehler Oberkirch GmbH*